Argued and submitted April 5, 2019, reversed and remanded March 4, 2020

In the Matter of the Compensation of
Lloyd R. Fleming, Claimant.

Lloyd R. FLEMING,
*Petitioner,*

*v.*

SAIF CORPORATION
and Treske Precision Machining,
*Respondents.*

Workers' Compensation Board
1504074; A165693

461 P3d 261

Claimant seeks judicial review of an order of the Workers' Compensation Board affirming respondent SAIF's denial of claimant's occupational disease claim for a right shoulder condition. The board concluded that claimant's prior disputed claim settlement (DCS) under ORS 656.289(4) with his previous employer, in which he stipulated that his shoulder condition was not compensably related to his work for that employer, precluded him from contending, against the employer in this case, that that employment contributed to his claimed occupational disease. Claimant argues that his DCS with a previous employer does not preclude him from asserting, in the context of a claim against his subsequent employer, that that employment contributed to his claimed occupational disease. *Held*: ORS 656.289(4) does not state or imply that a DCS with a previous employer, as a matter of law, precludes a claimant from litigating the role that previous employment may have played in determining the compensability of a subsequent claim against an employer not bound by a DCS with that claimant. The board erred in concluding otherwise.

Reversed and remanded.

Julene M. Quinn argued the cause and filed the briefs for petitioner.

Julie Masters argued the cause and filed the brief for respondents.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

LAGESEN, P. J.

Reversed and remanded.

DeVore, J., dissenting.

**LAGESEN, P. J.**

Claimant seeks judicial review of an order of the Workers' Compensation Board. In that order, the board affirmed respondent SAIF's denial of his occupational disease claim for a right shoulder condition. The board concluded, applying *Gilkey v. SAIF*, 113 Or App 314, 832 P2d 1252, *rev den*, 314 Or 573 (1992), that claimant's prior disputed claim settlement (DCS) under ORS 656.289(4) with his previous employer, in which he stipulated that his shoulder condition was not compensably related to his work for that employer, precluded him from contending, in this proceeding involving an occupational disease claim against a different employer, that that employment contributed to his claimed occupational disease. On review, claimant argues that the board's interpretation of *Gilkey* is incorrect and that the board erred when it concluded that claimant's DCS with respect to the claim against his prior employer precluded him from asserting, in this proceeding, that his previous work contributed to his claimed occupational disease in his right shoulder. We agree with claimant and, therefore, reverse and remand to the board.

The dispositive facts in this case are not in dispute. Claimant worked as a saw fitter for Simonds International from 2010 to 2013. His primary responsibilities included grinding large band saws and rolling out welds, all of which put considerable pressure on his arms. In 2012, claimant began experiencing significant pain whenever he would raise or lower his right arm. He visited his doctor, who diagnosed him with a full thickness partial tear of his right rotator cuff. Claimant filed for workers' compensation and Simonds's insurer, Liberty Northwest Insurance Company, accepted the claim. Claimant underwent several weeks of treatment during which the condition improved significantly. In February 2013, claimant was released back to regular full duty with no permanent limitations.

In November 2013, claimant left his job with Simonds to work for Treske Precision Machining. He worked at this job without difficulty until July 2014, when the pain in his shoulder returned. Claimant returned to see his doctor again, who discovered that his condition had worsened to

a full thickness rotator cuff tear. Claimant requested that Liberty, as Simonds's insurer, accept the full thickness tear as a worsening of the rotator cuff tear accepted by Liberty in 2012. In evaluating claimant's request, Liberty scheduled an insurer-arranged medical examination (IME) of claimant. After examining claimant, the IME doctor concluded that claimant's current rotator cuff tear was the result of a condition that was preexisting at the time of his 2012 rotator cuff injury. For that reason, Liberty denied claimant's claim for a worsening of the 2012 condition.

Claimant nonetheless underwent surgery to repair his rotator cuff and sought review of Liberty's denial. However, before a hearing was held in claimant's case, claimant and Simonds, acting through Liberty, agreed to settle the case by DCS under the authority of ORS 656.289. The DCS recited the competing contentions of claimant and Liberty regarding claimant's rotator cuff tear that "[e]ach party has substantial evidence to support its factual allegations," that there was a "bona fide dispute between the claimant and [Liberty]," and that "[t]he parties have agreed to compromise and settle the denied claim under the provisions of ORS 656.289(4)." Under the terms of the DCS, claimant received $25,000 in exchange for allowing Liberty's denial of his worsening claim to remain in force. The DCS also provided that claimant agrees that the "legal effect" of the settlement would be "the same as if the claimant admitted and agreed to the accuracy of the contentions of [Liberty]" recited in the agreement.

Shortly after entering into the DCS, claimant initiated the occupational disease claim at issue in this case against his current employer, Treske, insured by SAIF. Claimant asserted that, although working conditions at Treske were not the major contributing cause of his injury, Treske was still liable for his current rotator cuff condition by virtue of the "last injurious exposure rule" (LIER), applicable to occupational disease claims under *Inkley v. Forest Fiber Products Co.*, 288 Or 337, 605 P2d 1175 (1980). As had Liberty, SAIF scheduled an IME of claimant. Just as before, the examining doctor concluded that claimant's work conditions were not the major cause of his full thickness rotator cuff tear. As a result, SAIF too denied claimant's claim.

Claimant requested a hearing before an administrative law judge (ALJ), who upheld SAIF's denial of the claim. The ALJ held that, under *Gilkey*, 113 Or App 314, claimant's DCS with Liberty as a matter of law operated to preclude him from contending that his employment with Simonds was a cause of his current rotator cuff condition. That, according to the ALJ, meant that claimant's right shoulder condition had to be treated as a preexisting condition for purposes of his claim and that claimant had to "prove that his work at Treske was the major contributing cause of the combined condition and pathological worsening of his right shoulder condition." Because the medical evidence submitted by claimant did not address that point at all, the ALJ concluded that claimant had not met his burden of proof and affirmed SAIF's denial.

Claimant sought review by the Worker's Compensation Board, which adopted and affirmed the ALJ's order. On review before the board, claimant argued that the DCS that he entered into to resolve his prior claim against Simonds did not preclude him from asserting, in the context of the instant claim, that his employment at Simonds contributed to his claimed occupational disease. *Gilkey*, he argued, is distinguishable because, in that case, the claimant's prior DCS and subsequent claim involved the same employer. Here, claimant's prior DCS involved a different employer from the one he now asserts a subsequent claim against. Instead, claimant asserted that *Ahlberg v. SAIF*, 199 Or App 271, 111 P3d 778 (2005), controls. *Ahlberg* provides that, under the LIER, a worker's compensation claimant can rely on "*any and all* working conditions" to establish compensability of his current injury. *Id.* at 276 (emphasis in original). SAIF, Treske's insurer on the claim, argued in response that the ALJ correctly decided that *Gilkey* controls.

The board ultimately adopted the ALJ's opinion and order, employing largely the same reasoning. The board rejected claimant's attempt to distinguish *Gilkey*, explaining that, in its view, *Gilkey* did not turn on the fact that the prior DCS and subsequent claim both involved the same employer. Instead, the board understood *Gilkey* to turn on the express wording of the DCS at issue. The board explained

that here, just as in *Gilkey*, claimant "*expressly stipulated and agreed* that his then-current right shoulder conditions (which included the current claimed conditions) were not related or attributable to his employment exposure (including his work injury and work activities) with Simonds and were due, instead, to nonwork-related causes or subsequent injuries or work activities." (Emphasis in original.) Those stipulations, even though they were included in a settlement agreement to which Treske was not a party, were stipulations that bound claimant on his claim against Treske. Claimant sought judicial review of the board's decision.

The legal effect of a DCS under ORS 656.289(4) on a subsequent claim against a different employer presents a question of law, so we review for legal error. ORS 183.482(8).

As an initial matter, the board erred when it concluded that *Gilkey* stands for the proposition that a DCS under ORS 656.289(4) binds a claimant in the context of a different claim against a different employer. That is because that issue was not presented in *Gilkey*. At issue in *Gilkey* was the legal effect of a DCS in the context of the claimant's subsequent claim against the same employer and the same insurer. We were not asked to address, and did not address, the extent to which a nonparty to a DCS might rely on it to resolve factual issues in the context of a subsequent proceeding. To answer that question, we must interpret ORS 656.289(4) by examining its text in context. *See State v. Couch*, 341 Or 610, 617, 147 P3d 322 (2006).

ORS 656.289(4) provides:

"(a)   Notwithstanding ORS 656.236, in any case where there is a bona fide dispute over compensability of a claim, the parties may, with the approval of an Administrative Law Judge, the board or the court, by agreement make such disposition of the claim as is considered reasonable.

"(b)   Insurers or self-insured employers who are parties to an approved disputed claim settlement under this subsection shall not be joined as parties in subsequent proceedings under this chapter to determine responsibility for payment for claim conditions for which settlement has been made.

"(c)  Notwithstanding ORS 656.005(21), as used in this subsection, 'party' does not include a noncomplying employer, except where a noncomplying employer has submitted a disputed claim settlement with a claimant for approval before the claim has been referred to an assigned claims agent by the director. Upon approval of the disputed claim settlement, the Administrative Law Judge, the board or the court shall mail to the director a copy of the disputed claim settlement."

The text of paragraph (b) speaks directly to the legal effect of a DCS in a subsequent proceeding addressing a condition addressed by the settlement. That effect, the statute explains, is that insurers or self-insured employers "who are parties" to a DCS "shall not be joined as parties in subsequent proceedings under this chapter to determine responsibility for payment for claim conditions for which settlement has been made." That text clarifies that the legal effect of a DCS is to resolve an insurer's or employer's *responsibility* to the claimant for *payment* with respect to a claim condition that has been settled; once an insurer or self-insured employer has entered into a DCS, it can no longer be made to participate in any subsequent proceeding about the condition or conditions resolved by the DCS, and can no longer be made to pay for the condition or conditions. The text of the statute, notably, does not state or imply that the effect of a DCS goes beyond that to resolve as a factual matter for the purposes of a subsequent proceeding what role employment with the relevant insured or self-insured employers might have played in the claimed condition. Indeed, the statutory text's explicit contemplation of the possibility of subsequent proceedings in which the settling self-insured employer or insurer's responsibility would otherwise be at issue tends to suggest that the legislature anticipated that a DCS would not conclusively resolve factual issues for the purposes of such proceedings. Had the legislature intended for the legal effect of a DCS in subsequent proceedings to go beyond what it expressly stated in ORS 656.289(4)(b), we think that it would have said so expressly.[1]

---

[1] We have reviewed the legislative history of ORS 656.289. The legislature did not address explicitly the issue presented by this case, but we see no indication that the legislature intended that a DCS would be legally binding on a claimant in subsequent proceedings involving nonparties to the DCS.

The dissenting opinion reaches a contrary conclusion, but its analysis rests on several manifest fault lines. First, the opinion strays from the basis of the board's order, the arguments presented to us, and, perhaps most saliently, our case law. In *Gilkey*, we held squarely that a DCS does not give rise to claim preclusion or issue preclusion. *Gilkey*, 113 Or App at 317. Contrary to the dissenting opinion's suggestion, that holding in *Gilkey* was not *dictum*. The board in *Gilkey* had relied on principles of preclusion, and we were explaining that the board erred in doing so, though we ultimately concluded that we could affirm on an alternative basis identified by the board. *Id*. And, in this case, the board did not purport to apply preclusion principles, neither party disputes the nature of *Gilkey*'s holding, and neither party asks us to overrule that preclusion holding. Second, the opinion relies on a conclusory and questionable reading of ORS 656.289(4) to the extent that it suggests that the board's fairness review of a DCS effectively converts the DCS into an order of the board; it is far from a foregone conclusion that fairness review converts a private settlement into a board order. Third, the dissenting opinion draws authority from treatise passages that do not, on their face, bear much resemblance to Oregon's statutory workers' compensation scheme and, therefore, do not provide insight into the policy choices made by the Oregon legislature in enacting that scheme. For these reasons, the opinion ultimately does not answer the core question presented by this case: Did the legislature intend for a DCS entered into under ORS 656.289 to be binding in a subsequent proceeding between a party to the agreement and a nonparty?

For those reasons, the board erred when it concluded that claimant's DCS, as a matter of law, precluded him from litigating the role his employment with Simonds may have played in the shoulder condition on which his occupational disease claim against Treske is founded.[2] We therefore reverse and remand.

Reversed and remanded.

---

[2] The parties have not addressed the extent to which stipulations in a DCS may be entered into evidence in a subsequent proceeding against a nonparty to the DCS, and we express no opinion on the issue.

**DeVORE, J.,** dissenting.

This workers' compensation case presents an open question whether the stipulated facts in a disputed claim settlement (DCS), approved by the Workers' Compensation Board in a prior claim, should be recognized as prior determinations of the board when claimant disclaims those stipulated facts in a new claim against his next employer. The question can be posed, contemplating two very different possibilities. When claimant makes a claim against the subsequent employer based on the same medical history, should the board regard the prior DCS stipulations to be irrelevant to the subsequent claim, akin to terms of a private settlement with a third party? Or, are those stipulations to be regarded as public determinations of ultimate fact that were approved by the board so as to be binding on claimant in both the prior, settled claim and the current, subsequent claim?

The majority decides that the board erred by regarding claimant's stipulations in the prior DCS as binding on claimant in this subsequent claim. Looking at the same statutes and case law, I am not persuaded that the board erred. Looking at the context of the workers' compensation system, I suspect that the answer should be that, because the stipulations are the bases for the board's approval of a DCS with the prior employer done within the context of the workers' compensation system, they are determinations of the board as to those stipulated facts for purposes of claimant's claims against the both settled and subsequent employers. Regardless which answer prevails today, the question presented deserves more attention even if only from the exploration of the question in this opinion. The question may deserve attention from the practicing bar or a supervising legislature.

## FACTS

From 2010 through part of 2013, claimant worked for his prior employer, Simonds International Corporation (Simonds). In July 2012, he had a nondisabling shoulder strain, which was accepted by Liberty, Simonds's insurer. In February 2013, claimant was released with no permanent limitations.

In November, 2013, claimant began working with Treske Precision Machining, Inc. (Treske). In July 2014, he experienced right shoulder symptoms.

In January 2015, he filed a claim against former employer Simonds and Liberty for a new medical condition or an aggravation of his July 2012 injury. In March 2015, Liberty issued a partial denial. Claimant sought review and, in the meantime, underwent surgery for his rotator cuff condition.

In June 2015, claimant, Simonds, and Liberty entered into a disputed claim settlement. As required by rule, the DCS recounted the conflicting contentions of the parties. *See* OAR 438-009-0010 (quoted later). Among the contentions, claimant had asserted that the current conditions were compensable conditions arising out of the July 2012 work activities. In reply, Liberty had asserted that the previously accepted right shoulder strain had been resolved without the need for further medical treatment and was no longer the material contributing cause of disability or a need for treatment. After detailing the current conditions, Liberty made further allegations that would become the basis of the parties' stipulations to resolve the claim. Liberty alleged that

> "claimant's current conditions * * * are not, in any way or degree of contribution, the result or consequence of claimant's on the job injury of July 20, 2012, nor materially related to his work activities with Simonds International Corp. *The conditions * * * are due to non-compensable, pre-existing conditions, and / or due to a new injury or subsequent work activities neither caused nor worsened by claimant's on the job injury of July 20, 2012. * * * [T]he denied conditions * * * are not medically or legally attributable to the claimant's employment with Simonds International Corp. under Oregon's compensability standards.*"

(Emphasis added.) The terms of the DCS specified that

> "[t]he claimant understands and stipulates that the denial entered in this case shall be construed to include the contentions of First Liberty Insurance Corporation as set forth above, and that the denial issued, including the contentions of First Liberty Insurance Corporation as set forth

above, shall forever remain in full force and effect, and that the execution of this document shall constitute a full and final waiver of the claimant's right to challenge or appeal from the denial, and *the claimant stipulates and agrees that the legal effect of this settlement shall be the same as if the claimant admitted and agreed to the accuracy of the contentions of First Liberty Insurance Corporation as set forth above*."[1]

(Emphasis added.) Administrative rule did not require that, in order to achieve settlement, claimant must admit or stipulate to Simonds's statement of the ultimate facts. *See* ORS 656.289(2) (DCS with board approval); OAR 438-009-0010 (required terms of a DCS).[2]

In exchange for his agreement to the terms of the DCS, Liberty agreed to pay his medical bills to date, plus $25,000.[3] The parties agreed that the amounts paid were accepted "in full settlement of all issues raised or which could have been raised on or before the date of this agreement." The DCS explained that,

---

[1] The document provided that claimant retained all rights he may have for medical services under ORS 656.245, aggravation under ORS 656.273, own motion proceedings under ORS 656.278, and vocational assistance under ORS 656.340, but the document did not provide that claimant retained rights involving a later claim for occupational disease under ORS 656.802.

[2] In relevant part, OAR 438-009-0010 requires:

"(2) A disputed claim settlement shall recite, at a minimum:

"(a) The date and nature of the claim;

"(b) That the claim has been denied and the date of the denial;

"(c) That a bona fide dispute as to the compensability of all or part of the claim exists and that the parties have agreed to compromise and settle all or part of the denied and disputed claim under the provisions of ORS 656.289(4);

"(d) The factual allegations and legal positions in support of the claim;

"(e) The factual allegations and legal positions in support of the denial of the claim;

"(f) That each of the parties has substantial evidence to support the factual allegations of that party;

"(g) A list of medical service providers who shall receive reimbursement in accordance with ORS 656.313(4), including the specific amount each provider shall be reimbursed, * * *; and

"(h) The terms of the settlement, including the specific date on which those terms were agreed."

[3] He agreed that those payments were "compensation for the consequences of impairment which claimant anticipates will affect him for the rest of his life."

"[f]or purposes of this agreement 'issues raised or which could have been raised' includes any and all claims for new medical conditions arising out of the claimed condition and identified or diagnosed in the medical record to date."

The DCS provided that

"[c]laimant agrees that by signing this Disputed Claims Settlement agreement, *claimant waives his right to file a claim for any other condition associated with or arising out of his denied claim*, or to file a claim for civil remedies arising out of the denied claim under ORS 656.019."

(Emphasis added.) Finally, the DCS provided that it was not binding unless, and until, it was approved by an administrative law judge (ALJ) or the board. In July 2015, the DCS was approved by the board.

The day after claimant signed the DCS, he filed the present claim for his shoulder condition against Treske, his subsequent employer, and SAIF, its insurer based upon the same medical records. He now contended that this shoulder condition was the result of an occupational disease and that his work exposure with *both* employers—Simonds and Treske—should be considered. By taking that approach, he sought to avoid needing to prove that working conditions at Treske were the major contributing cause of his injury; instead, he would only need to prove that Treske's work was the "last injurious exposure," making Treske fully liable for his shoulder condition. *See Inkley v. Forest Fiber Products Co.*, 288 Or 337, 342-43, 605 P2d 1175 (1980) (last injurious exposure rule).

SAIF denied the claim. An ALJ upheld the denial, treating the DCS as determining that work with Simonds made no contribution to the conditions, pursuant to our decision in *Gilkey v. SAIF*, 113 Or App 314, 832 P2d 1252, *rev den*, 314 Or 573 (1992). With work for only one, not two employers at issue, the ALJ concluded that claimant's proof did not establish that work with Treske was the major contributing cause of a combined condition or worsening of the diseased under ORS 656.802(2). On review, the board agreed, emphasized the particular terms of the DCS in this case, and affirmed the ALJ's conclusion.

## MAJORITY OPINION

The majority opinion concludes that the board erred in relying on *Gilkey*. The majority recognizes that *Gilkey* involved a claim that followed a DCS, but the majority observes that the case involved a subsequent claim against the same employer and not a case with a claim against a subsequent employer. For that reason, the majority determines that *Gilkey* provides no answer. To the majority, *Gilkey* begs the question. As a result, the majority turns to the authorizing statute that describes a DCS. ORS 656.289(4)(a) provides:

> "Notwithstanding ORS 656.236, in any case where there is a bona fide dispute over compensability of a claim, the parties may, with the approval of an Administrative Law Judge, the board or the court, by agreement make such disposition of the claim as is considered reasonable."

In the next paragraph of the statute, the majority finds an answer implied on the basis that nothing more is written in that paragraph. ORS 656.289(4)(b) provides:

> "Insurers or self-insured employers who are parties to an approved disputed claim settlement under this subsection shall not be joined as parties in subsequent proceedings under this chapter to determine responsibility for payment for claim conditions for which settlement has been made."

The majority appropriately observes that ORS 656.289(4)(b) provides that insurers or self-insured employers cannot be sued again after settlement. Without more said in text, the majority infers that, because the provision says nothing about the effect of a DCS on a subsequent claim against another employer, the provision necessarily implies that the legislature "anticipated that a DCS would not conclusively resolve factual issues for the purposes of such proceedings." 302 Or App at 548. Essentially, the majority infers that a DCS has no further significance for a claimant, despite the fact that the subsequent claim includes the same record. In a footnote, the majority candidly reports that its review found nothing in legislative history to shed light on the intent of the provision as concerns related claims against subsequent employers.

In my opinion, it is ORS 656.289(4) that provides no answer. It begs the question. The provision merely says that, after insurers or self-insured employers have been parties to a DCS, they "shall not be joined as parties in subsequent proceedings." Essentially, the provision says that "a settlement is a settlement" and says nothing more. Given those terms, the provision implies nothing about the present question. Yet, the majority infers that, because the legislature said that much, the legislature somehow "anticipated" that a DCS should have no other effect. I believe that such an inference of legislative intention is, not only unsupported by legislative records, it is not implicit in textual silence. As to silence in a statute, we know that our first rule of construction is not to insert what has not been written. ORS 174.010.[4]

If legislative history does show something, it is that ORS 656.289(4)(b) was intended to provide that "a settlement is a settlement." That itself is significant because it says nothing more. The provision was added in 1995 with Senate Bill (SB) 369. Or Laws 1995, ch 332, § 35. The bill summary explained simply that the amendment "states that once a worker and insurer have agreed on a disputed claim settlement, the insurer cannot be compelled to attend future hearings on the claim." Exhibit A, Senate Committee on Labor and Government Operations, SB 369, Jan 30, 1995 (bill summary). Later, the staff summary explained that ORS 656.289(4)(b) "[e]liminates [any] requirement to appear at hearing on [an] issue which has been settled." Exhibit F, Senate Committee on Labor and Government Operations, SB 369, Feb 8, 1995 (statement of Staff Original Measure Effects and Amendment Effects). It added "that once a worker and insurer have agreed on a disputed claim settlement, the insurer cannot be compelled to attend future hearings on the claim." *Id*. The legislative record confirms that the only thing the legislature contemplated was that a

_____

[4] The familiar admonishment of ORS 174.010 says:

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

DCS binds the parties. Because that is so, there is no reason to imagine that the legislature "anticipated" anything else. Silence in legislative materials, like silence in statutory text, does not support the majority's answer. Without something better, the majority's construction of the statute—based on its thin inference of intention—is unreasonable.

## SETTLEMENTS IN WORKERS' COMPENSATON

Rather than take guidance from silence, the court should take guidance from the significance of settlement within the workers' compensation system, two signposts in case law, issue preclusion, and a reflection on the consequences of the majority's answer. I address those topics in turn.

Settlements in workers' compensation are not—at least *not necessarily*—merely private settlements between private parties with no other significance to the system. If we were to think of a compensation claim as merely a private, personal, adversary money claim against the particular employer, then we could go on to conclude, as some do, that settlements can freely occur without public oversight, protection of the settling worker, or significance to be accorded later to settlement stipulations. *See* 13 *Larson's Workers' Compensation Law* § 132.04[1] (rev ed 2019) (referring to a Kansas decision). The leading treatise comments:

> "What this overlooks is that the entire compensation system has been set up and paid for, not by the parties, but by the public. The public has ultimately borne the cost of compensation protection in the price of the product, and it has done so for the specific purpose of avoiding having the disabled victims of industry thrown on private charity or public relief. * * * [T]he employer and employee have no private right to thwart this objective by agreeing between them on a disposition of the claim that may, by giving the worker less than this amount, make the worker a potential public burden. The public interest is also thwarted when the employer and employee agree to a settlement which unnecessarily increases the cost of the product by giving the worker more than is due."

*Id*. If we begin with that basic understanding, then we can begin to find an answer to the question presented. It is an

answer that takes its guidance from how settlements of workers' compensation claims occur.

Under ORS 656.289(4), a DCS can occur only with approval of an ALJ, the Workers' Compensation Board, or a court. That is significant. The familiar treatise explains:

> "If the statute requires that a settlement have Commission approval, a settlement lacking such approval amounts to nothing more than a voluntary payment of compensation. *** [I]t does not rise to an 'award' upon which procedures for reopening can be based, nor is it a waiver of the right to controvert the claim."

13 *Larson's Workers' Compensation Law* § 132.06[1] (rev ed 2019). The effect of board approval becomes significant. *Larson's* states:

> "If the settlement is approved, it takes on the quality of an award, and the parties can no more back out of it than any other kind of award."

*Id*. at § 132.06[2]. Another treatise adds:

> "Since an approved settlement agreement is given the effect of a workers' compensation award, its determinations are given collateral estoppel effect."

3 *Modern Workers Compensation* § 300:16 (2019); *see Drews v. EBI Companies*, 310 Or 134, 140-42, 795 P2d 531 (1990) (issue preclusion applies to issues of fact or law in administrative proceedings).

This court has treated the determinations made after the board has approved a DCS like any other award or decision of the board. In *Southwest Forest Industries v. Archer*, 109 Or App 349, 351, 819 P2d 748 (1991), the claimant had entered into a DCS with an employer and insurer after a dispute over a back injury and psychological issues. In the language of his DCS, he agreed that the employer's contentions "shall be affirmed." *Id.* at 352. He worked for a subsequent employer and had ongoing back issues, but his claim against the subsequent employer failed when asserting a new condition. *Id*. As for his claim against the original employer, the board determined that his claim for aggravation was meritorious. *Id*. We concluded, however, that the board erred "as a matter of law" when it did not correctly

apply the "settlement order." *Id.* at 353. The DCS had upheld the acceptance of some injury and the denial of the psychiatric claim. *Id.* at 351-52. We observed, "The settlement order, however, does much more than that." *Id.* at 353. That DCS, in its stipulations, had "affirmed" that the "back problems were unrelated to his employment, had no physical origin and were due to psychiatric and psychological problems." *Id*. We reversed and remanded. *Id.* In material part, we did so because the agreed stipulations in the DCS operated as determinations of the ultimate facts of the claim, like any other decision of the board. *See id.*

Similarly, in *Wasson v. Evanite Fiber Corp.*, 117 Or App 246, 248, 843 P2d 1004 (1992), the claimant and employer entered into a DCS after claims of depression and hip and back conditions. The board treated the determination in the DCS that her depression was not compensable as dispositive, because it was the same condition denied in the DCS. *Id.* We resolved the appeal in language that regarded the DCS as a binding determination of ultimate facts like any other decision. We concluded:

> "Claimant also argues that, by not allowing her to relitigate issues settled by the DCS, we are denying her an opportunity to contest an issue that would be a viable subject for an aggravation claim if it had been resolved through litigation. However, the DCS was a final resolution of the compensability dispute concerning her depression. Absent a showing that the present psychological condition is different from the original condition permitting relitigating would undermine the *finality* for which employer, *and* claimant bargained."

*Id.* (first emphasis added; second emphasis in original).

Although circumstances vary, we have routinely regarded the factual determinations made in a DCS to be dispositive. *See International Paper Co. v. Pearson*, 106 Or App 121, 124, 806 P2d 189 (1991) (neither party disputes that it may not relitigate issues resolved by the DCS; the issue comes down to what, precisely, was resolved); *Miller v. Coast Packing Company*, 84 Or App 83, 88-89, 733 P2d 97, *rev den*, 303 Or 534 (1987) (DCS absolved second employer of responsibility; claimant is bound by its determination);

*Proctor v. SAIF*, 68 Or App 333, 335, 681 P2d 161 (1984) (claimant is bound by determination of DCS and can recover only if he has developed a new condition). What is important to observe about those cases is what they represent in the workers' compensation system. In those cases, a DCS is not a mere release of a worker's claim against an employer— as if whatever may have been stipulated does not matter. Rather, the DCS was an approved determination, according to its stipulations as to the ultimate facts. Those *factual* stipulations, if any, bound the claimant.

Like the majority, I recognize that these cases happen to be examples of disputes that arose between the claimant and the original employer who were parties to a DCS. Unlike the majority, I emphasize that a DCS is a unique form of settlement that takes place in the context of the workers' compensation system, that may or may not contain stipulations about the ultimate facts, and that is required to be approved by an ALJ or the board. To distinguish a DCS from a private party agreement that has no other significance to a claimant or others, it helps to see that a DCS is one of the more formal forms of settlement in the workers' compensation system. That is because the administrative regulation of settlement suggests that such formal settlements have a broader significance in the workers' compensation system than a private settlement outside workers' compensation.

In *Simmons v. Lane Mass Transit District*, 171 Or App 268, 271-74, 15 P3d 568 (2000), we reviewed the three types of formalized settlements in the workers' compensation system. A DCS, as contemplated by ORS 656.298(4)(a), is defined in OAR 438-009-0001(2) as a written agreement by which the parties make a reasonable disposition of a claim involving a bona fide dispute over the compensability of a claim. *Simmons*, 171 Or App at 272. That is to say, a DCS involves a claim that has been denied. *Id.* The rule "requires the parties to provide information to the Board, along with assurances that the claimant has been thoroughly informed of the effect of the DCS, before the Board will approve it." *Id.*

A claim disposition agreement (CDA), as contemplated in ORS 656.236, is defined in OAR 438-009-0001(1)

as a written agreement in which a claimant releases rights, an insurer, or a self-insured employer from obligations, except for medical services. Unlike DCS, a CDA involves an accepted claim. *Simmons*, 171 Or App at 272. Both types of settlements are required to be written, require that claimant be advised, and require that their provisions are reviewed and approved by an ALJ or the board. ORS 656.289(4) (DCS); ORS 656.236(1) (CDA).

A third type of settlement is a "settlement stipulation," for situations that are not suited to a DCS or CDA. *Simmons*, 171 Or at 273. A "settlement stipulation" need not be written, may be made orally by stipulation, does not require that claimant be advised of any specific information, and sets no criteria for the ALJ's approval. OAR 438-009-0005; *Simmons*, 171 Or App at 273.

The common feature among all three forms of settlements in the workers' compensation system is that they are not merely private settlements. They are not divorced from the adjudicatory process of workers' compensation. In particular, a DCS is a written disposition of a claim, concluding in denial, that cannot be accomplished without warnings to the claimant and cannot be effective without a decision of an ALJ or the board that concurs in the disposition based on the stipulations and other information provided.

Case law, recounted above, confirms that the disposition accomplished by a DCS is no less significant than that of an award made by the board in a contested decision. The only open question, presented by this case, is whether an exception should be made to treat a DCS as anything less than a decision of the board when claimant brings a claim—here based on the same medical records—against a successive employer while attempting to deny his stipulations on ultimate facts contained in a DCS approved by the board.

## WHEN A DCS IS A STIPULATED JUDGMENT

If we return to the text of the statute, we are reminded that a DCS is not a mere private settlement. It is not outside the workers' compensation system. We are told in ORS 656.289(4)(a) that the parties may, "*with the approval of* an Administrative Law Judge, *the board* or the court, by

agreement make such disposition of the claim as *is considered reasonable.*" (Emphases added.) The "approval" and "considered reasonable" language means that no DCS is effective unless and until an ALJ, the board, or a court approves. The parties must agree that the DCS is reasonable, but statute does not delegate to the parties the ultimate decision about what is reasonable. Instead, the statute requires that, as here, the *board* must act to make the determinations required. Under OAR 438-009-0010(2) and (7), the approval process is based on the information required and the stipulations reached. The statute and rule require that the board engage in the claim, consider the conflicting allegations, review stipulations on the merits, if any, and agree with the parties' proposed disposition. Under both statute and rule, it is the board that must "consider" that the "disposition" is reasonable. ORS 656.289(4); OAR 438-009-0010(7). To be reasonable requires that the disposition be one permitted by law, be consistent with the ultimate facts recited in any stipulations reached, and be consonant with the workers' compensation system. *See, e.g.*, *EBI Companies v. Freschette*, 71 Or App 526, 531, 692 P2d 723 (1984), *rev den*, 298 Or 822 (1985) (holding that a DCS violated the statutory prohibition against releases). The engagement of the board, in reviewing any stipulations on the merits, makes the DCS a determination of the board like any other determination in any other award. Simply put, a DCS—particularly one with factual stipulations on the merits—has no less significance than a stipulated judgment. And, a stipulated judgment has the same effect as judgment after a trial on the merits. *See Webber v. Olsen*, 330 Or 189, 196, 998 P2d 666 (2000) ("A stipulated judgment has the same effect as a judgment that is entered after a trial on the merits of a claim.").

From the cases reviewed above, we know that a DCS is like a stipulated judgment. In *Archer*, the DCS did "much more" than serve as a settlement agreement to make a claim go away; it "affirmed" the factual determination that the claimant's back problems were "unrelated to his employment." 109 Or App at 353. In *Wasson*, the DCS established with "finality" that the psychological condition had already been determined not to be compensable. 117 Or App at 248; *see also Miller*, 84 Or App at 88-89 (claimant bound

by factual determination of responsibility); *Proctor*, 68 Or App at 335 (claimant bound by prior determination of prior condition). Although such cases involve claims against the same employer, the cases are resolved on the basis of the determinations of ultimate facts made in the DCS. Those determinations are the public determinations made in the sequence of a particular worker's claims that may be ongoing in a sequential manner of claims within the workers' compensation system. If determinations are made—whether by stipulation or contested claim—it makes no sense to treat approved determinations of fact as binding on claimant only as to a prior employer, but not binding on claimant as to the same facts in the current claim as to a successive employer. Our statute, administrative rule, and case law do not imply that the approved, factual determinations in a DCS should be ignored, deemed irrelevant, or assumed to be insignificant thereafter.[5]

As this court observed in *International Paper Co.*, 106 Or App at 124, the issue should not be whether the DCS can resolve factual issues in a stipulated disposition. Instead, "[t]he issue come down to *what*, precisely, *was* resolved by the settlement." (Emphases added.) In a case like this, that question is: What, if anything, were the stipulated statements of ultimate fact in the DCS at hand? As is apparent in OAR 438-009-0010(2)(e), the parties do not need to go so far as to agree to *one* set of ultimate facts. Instead, they could simply recite their conflicting "factual allegations and legal positions" and leave it at that. Or, in the alternative, they *may* choose to stipulate to one set of ultimate facts in resolving a claim in a DCS. That choice rests with the parties. The result of different choices is reflected in two cases that, like signposts, point to very different results depending whether parties included or omitted agreed stipulations of ultimate facts in a DCS.

---

[5] Taking the opposite view, the claimant here argues that, "while [the DCS] binds claimant legally, it *does not bind him factually to the employer's contentions*." He argues that, because he disputed the employer's contentions, "claimant may in the later claim and litigation against a different employer continue to make the same [original] contentions." Claimant, however, ignores that, after the recital of conflicting contentions, he stipulated to the employer's statements of ultimate fact that declared the Simonds's work exposure not to be a cause of injury or need for treatment. He *did* stipulate "factually to the employer's contentions."

In *Gilkey*, the ultimate facts determined in a prior DCS proved dispositive. 113 Or App at 317. That claimant suffered an initial hip injury that was compensable and eventually was closed. *Id.* at 316. Two years later, the claim was reopened in contemplation of hip surgery for degenerative changes. *Id.* SAIF denied compensability. *Id.* Nevertheless, claimant and SAIF entered into a DCS that provided that SAIF would pay $4,000. *Id.* It was agreed that the denial would "remain in full force and effect" and that claimant understood that there would be no future recourse for medical care or benefits arising out of the Workers' Compensation Act as a result of the degenerative hip disorders involving congenital dysplasia of both hips or degenerative osteoarthritis of the left hip. *Id.* Four years later, claimant's hip pain increased and he filed an occupational disease claim with SAIF and Liberty Northwest Insurance Corporation, a successor insurer. *Id.* Both insurers denied the disease claim. *Id.*

The board made four determinations: (1) that the hip condition had worsened more than might be expected by virtue of aging alone; (2) *that the DCS had the effect of establishing that the degenerative hip condition as it existed on the date of the DCS was entirely the result of noncompensable causes*; (3) that claimant was barred by claim and issue preclusion from arguing that the original injury contributed to the hip condition; and (4) that the claimant had failed to show that work was the major contributing cause of the worsening. *Id.* at 316-17.

On review, SAIF and claimant agreed that claim and issue preclusion did not apply. *Id.* at 317. Recognizing the parties' agreement on the point, we remarked that claim and issue preclusion did not apply. *Id.* However, the question of claim or issue preclusion was not disputed by the parties, was not developed in arguments, and was not an issue that was essential for our opinion in *Gilkey. See id.* We decided the appeal on another basis. In other words, our remark about issue preclusion was *dictum. See Halperin v. Pitts*, 352 Or 482, 494, 287 P3d 1069 (2012) (describing as *dicta* prior comments in decision where there was no dispute presented); *State ex rel. Roberts v. Olcott*, 94 Or 633, 651-52, 187 P 286 (1920) ("[Q]uestions not fairly within the issue

made by the pleadings and presented to the court cannot be authoritatively passed upon in any case, and, if the court goes outside of these questions and decides others which are not before it, its utterance is a mere dictum which binds no one."); *State v. Zimmerman*, 170 Or App 329, 334, 12 P3d 996 (2000) (noting that, in at least two prior cases, the court stated that second-degree robbery is a lesser included offense of first-degree robbery, but, because the issue was not squarely presented in either case and the statement was not essential to the disposition of either decision, the court declined to follow the *dicta* of those decisions).

On appeal, the parties disputed the board's other determinations, and, accordingly, we addressed those other issues. *Gilkey*, 113 Or App at 317. Specifically, we upheld with the board's second determination that the terms of the prior DCS established the particular, ultimate facts. *Id.* We observed that,

> "by virtue of the DCS, the parties *have agreed* that there is no compensable relationship between the 1975 injury and claimant's degenerative hip condition. They are bound by that agreement, and the 1975 injury cannot be regarded as having contributed to claimant's present condition."

*Id.* (emphasis in original). In so saying, we concurred with the board's treatment of the DCS as determining those facts. *Id.* We approved the board's statement that, by reason of the DCS, the prior injury "has been found by law to have no effect" and that the remaining evidence did not establish work activities as the major contributing cause of the current condition and resultant surgery. *Id.* In other words, the specific terms of the claimant's prior DCS were binding on the claimant when he later presented a related claim involving the same medical history.

In contrast, a DCS that lacked express admissions proved *not* to be an obstacle to a subsequent claim in *Bennett v. Liberty Northwest Ins. Corp.*, 128 Or App 71, 73, 875 P2d 1176 (1994). Originally, the claimant began noticing a hearing loss while working in noisy conditions for Caterpillar, Inc. *Id.* He continued working in noisy conditions for Siltec Corporation and filed a claim against both employers for hearing loss. *Id.* Both employers denied the claim as a

condition not arising out of its employment. *Id.* Caterpillar, however, entered into a DCS with the claimant. *Id.* In that agreement, the two parties agreed that there was a bona fide dispute and that both parties had "evidence [in respect of] their respective positions." *Id.* Caterpillar agreed to pay $7,500, and claimant agreed he would take no other benefits on account of the claim. *Id.* at 73-74. The claim against Siltec, the second employer, went to hearing. *Id.* at 74. A hearings referee and the board affirmed the denial. *Id.*

On review before this court, the claimant contended that he had not elected to prove his case solely against the second employer Siltec. *Id.* at 75. Siltec contended that he had elected to prove the claim solely against it. *Id.* We recognized that a claimant *could* choose to make its case against a single employer but that the claimant Bennett had made claims against both employers. *Id.* at 78. In critical part, we noted that

> "[t]*he DCS does not, by its terms, evidence an agreement by claimant that work at Caterpillar did not contribute in any way to claimant's loss of hearing;* nor does it by its terms indicate an election to prove actual causation as against Siltec. There is nothing in the DCS with Caterpillar that shows an election to prove actual causation against Siltec."

*Id.* (emphasis added). Because the DCS did not admit that activities at Caterpillar played no role, we held that the claimant may include conditions there as part of his proof of employment as a major contributing cause of his hearing loss. *Id.* Accordingly, the claim against Siltec could be determined according to the last injurious exposure rule.[6] *Id.*

Paired as signposts, *Gilkey* and *Bennett* show the differing effects of a DCS that does or does not include a set of ultimate facts expressed in stipulations and approved by the board.[7] In this case, the terms of the DCS are more like those in *Gilkey* than those in *Bennett*. Here, the stipulated admissions in the DCS, duly approved by the board, resolved the claim against the prior employer Simonds with a

---

[6] The dissent disagreed that the last injurious exposure rule should apply when it was uncontroverted that the disability was caused by exposure during the earlier employment. *Bennett*, 128 Or App at 79-82 (Edmonds, J., dissenting).

[7] The difference in outcomes is a precautionary note for parties' lawyers.

determination that the then-current conditions were "not, in any way or degree of contribution, the result or consequence of claimant's on the job injury \*\*\*, nor materially related to his work activities with Simonds \*\*\*." Claimant's shoulder problems were "non-compensable, preexisting conditions, and/or due to a new injury or subsequent work activities neither caused nor worsened by claimant's on the job injury \*\*\*." Specifically, claimant's conditions were determined to be "not *medically* or legally attributable to the claimant's employment with Simonds." (Emphasis added.) Claimant "admitted and agreed" to those statements in resolution of the claim. He did so reserving particular rights as to the original claim with specific statutory references but he did so without reserving rights to treat the past claim as part of a potential occupational disease claim under ORS 656.802. He specifically waived his right to "file a claim for any other condition associated with or arising out of his denied claim." In all, claimant's stipulations were specific, concrete, numerous, and just determinative as those in *Gilkey*.

To be sure, the majority is correct that *Gilkey* did not involve a subsequent claim against a successive employer. I agree that something more is required to explain why the claimant's stipulations or the board's determinations in an approved DCS, when recognized as determinations of the board, should be regarded as binding on claimant in the next claim against the subsequent employer. The general answer has already been broached with reference to the nature of the workers' compensation system: "If the settlement is approved, it takes on the quality of an award," 13 *Larson's Workers' Compensation Law* § 132.06[2], and, "[s]ince an approved settlement agreement is given the effect of a workers' compensation award, its determinations are given collateral estoppel effect," 3 *Modern Workers Compensation* § 300:16.

Oregon law recognizes that issue preclusion applies to administrative proceedings, provided that the tribunal's decision-making process include certain requisite characteristics. *Drews*, 310 Or at 142. Our law recognizes that issue preclusion may apply either to conclusions of law or findings of fact. *Id*. at 140. And, issue preclusion applies to workers' compensation determinations. *Id*. at 142. Our requirements

are that (1) the issue in the proceedings is the same; (2) the issue was actually litigated and essential to a final determination on the merits in the prior proceeding; (3) the party sought to be precluded had a full and fair opportunity to be heard on the issue; (4) the party sought to be precluded was a party or in privity with a party in the prior proceeding; and (5) the prior proceeding was the type of proceeding to which the court will give preclusive effect. *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993).

In this case the requisites for issue preclusion are satisfied: (1) The issue of the role of claimant's Simonds work to his injury was the same in the prior proceeding. (2) The issue was actually litigated in a disputed claim and resolved with finality in a DCS with stipulations of ultimate facts, making the DCS the functional equivalent of a stipulated judgment. (3) Claimant had a full and fair opportunity to litigate his claim. (4) Claimant was the same party in the prior claim. (5) And determinations of the board are the kind of administrative determinations to which the court accords finality.[8]

Given issue preclusion, the stipulations of ultimate fact contained in a prior DCS should be the starting point for a subsequent claim, like any other prior factual determination of the board in any other prior decision, whether against the same employer (*e.g.*, an aggravation claim) or another employer (*e.g.*, a disease claim). That is so because a DCS determination, when made with stipulations of ultimate facts, is but a part of one person's continuing history in the workers' compensation system. To recognize that such a DCS is part of this worker's history does not mean that he would necessarily be denied subsequent workers' compensation benefits. It only means that the appropriate standard of compensability would be proof that the subsequent

---

[8] If I am mistaken in reading our remark in *Gilkey* as *dictum*, then that remark should be reconsidered and rejected as "plainly wrong." *See State v. Civil*, 283 Or App 395, 407-17, 388 P3d 1185 (2017) (examining what was not addressed in a prior decision; describing prior decision to be overruled when "plainly wrong"); *see also Farmers Ins. Co. v. Mowry*, 350 Or 686, 692-99, 261 P3d 1 (2011) (discussing considerations for overruling erroneous decisions). The remark was made in the absence of developed briefing on an issue, about an issue that was not disputed on appeal, and before the Supreme Court updated and articulated its exegesis on issue preclusion in *Nelson*. *See* 318 Or at 104.

employment was the major contributing cause of his injury or need for treatment.

The conclusion—that a prior DCS with stipulations matters in a subsequent claim—is reinforced when reflecting on the consequences of the opposite conclusion posed by the majority's opinion. The consequences are untenable, in one way or another, regardless whether we view a DCS, because it pays benefits, as implying claimant suffered work-related harm despite stipulations to the contrary, or we view the DCS, because it says so, as determining that the prior employment with Simonds was not a cause of injury or need for treatment.

One untenable consequence of the majority's decision is inconsistent standards. Although claimant stipulated that work for a prior employer had no relationship to his condition, the standard for the next employer's liability reduces to the "last injurious exposure" standard, rather than remain at the "major contributing cause" standard that ordinarily applies when only the second employer's work is at issue. Another worker, whose only exposure to injury occurred with the second employer, would need to prove compensability by the "major contributing cause" standard. Although this claimant stipulated that prior employment was not a cause of his condition, this claimant would prove compensability with an inconsistent, lesser standard of "last injurious exposure." Those two workers, working for the same employers with seemingly the same work exposures, would have two different legal standards of compensability.

Another untenable consequence of the majority's decision is the prospect of double recovery—in whole or in part. Although claimant has recovered the benefits of a DCS with the first employer requiring payment of all medical bills to date and the further sum of $25,000 for his shoulder condition, he can recover benefits again from a second employer based on the same set of medical records. To be sure, it is difficult to imagine how claimant could claim a right to keep payment for medical bills already paid, but, then again, tort law allows a personal injury plaintiff to retain the measure of damages that is the full face amount medical bills despite the fact "write-offs" meant that a lesser sum actually

satisfied the billing of medical providers. *White v. Jubitz Corp.*, 347 Or 212, 236-37, 219 P3d 566 (2009). Although the prospect of claimant retaining a second payment of medical bills should somehow be impermissible within the workers' compensation system, claimant has not offered any suggestion how that would be avoided.

More to the point, claimant has not suggested that he would offset the $25,000 already received for his shoulder condition against the award of disability he seeks for the same condition as against his second employer. His prior recovery may or may not have been adequate; it could have been a compromised sum on disputed compensability. But, he does s eek additional recovery for the same condition without any consideration of the prior award already recovered with the DCS. It stands to reason that, in a different case, a claimant may make a favorable settlement with a first employer and make no stipulations of ultimate fact that would bind the claimant in a later claim against a subsequent employer. Yet, here, it seems untenable that a claimant who *does* make stipulations of ultimate fact, which the board adopts in a DCS, may disclaim those stipulated facts and expect the board to ignore them, permitting him the potential to recover twice for the same injury.[9]

Claimant, no doubt suffering disability whether from work or nonwork related causes, cannot be faulted for seeking to maximize his benefits. Nor can his employers be faulted for seeking appropriate determination of compensability. Only we can be faulted if our answer shortchanges a claimant or forces employers to overpay for the same injury.

## CONCLUSION

For all the reasons reviewed here, the DCS should be treated like a stipulated judgment when it contains stipulations of ultimate facts. We should recognize that, after

---

[9] Outside of workers' compensation in the world of personal injury, an injured party may keep a settlement sum that is more favorable than the settled party's percentage share of fault, but the settled party's percentage share of fault *is* nonetheless determined by a jury as among blameworthy parties, and that settled party's percentage of fault does reduce recoverable damages against the nonsettling defendant. *See* ORS 31.600(2) (determination of settled party's share of fault); ORS 31.610(2) (court shall determine the award of damages in accordance with the percentages of fault determined by the trier of fact).

board approval, a DCS with such stipulations represents the board's determinations. Nothing in statute or rule requires the board to disregard its prior determinations. Because that is so, the board did not err in recognizing that the factual terms of the DCS required that claimant prove that work conditions, other than those involving Simonds, were a major contributing cause of his shoulder condition. All agree that claimant's evidence failed to address whether his work with Treske (alone) met that standard. Therefore, I believe that the board acted with substantial evidence and reason when concluding that claimant had not carried his burden of proof.

I respectfully dissent.